UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
DONALD WILLIAMS,

        *Plaintiff*,

           **MEMORANDUM & ORDER**

    v.

           16-cv-6679(KAM)(SMG)

MAERSK LINE, LTD.,

        *Defendant*.
--------------------------------X

       Pending before the court is Defendant Maersk Line

Ltd.'s ("Maersk") motion for summary judgment on Plaintiff

Donald Williams' ("Williams") claims for punitive damages.  On

May 30, 2015, Williams slipped and fell aboard the *Maersk

Detroit* (the "*Detroit*").  Three days after his accident,

Williams treated at a clinic onshore and was, in quick

succession, declared fit-for-duty ("FFD") on June 3, 2015, and

then not-fit-for-duty ("NFD") for a period from June 10 to June

13, 2015.  Williams continued to seek treatment following these

diagnoses, and in the following months, physicians diagnosed a

litany of neurological and other conditions.  Treating

physicians declared Williams NFD for much of this period, but

none specified which of the many diagnosed illnesses, or all,

prevented Williams from returning to work.

       Williams sought maintenance and cure from Maersk on

the basis that the conditions for which he sought treatment

1

resulted from his accident aboard the *Detroit*.  Maersk disagreed

and declined Williams' request.  Although Williams' physicians

found him disabled, Maersk asserts that none of the causes of

Williams' disability stemmed from his onboard accident.

Williams filed this action to recover, *inter alia*,

maintenance and cure.  The complaint demands punitive damages on

the grounds that Maersk refused Williams' request for

maintenance and cure in bad faith.  Maersk concedes that there

may be an issue of fact regarding whether at least certain of

Williams' injuries resulted from his onboard accident.  But

Maersk also argues there is no evidence that it acted in bad

faith in denying Williams' claim and, therefore, moves for

summary judgment on the punitive damages claim.  For the reasons

set forth below, Maersk's motion is DENIED.

### Background[1]

---

[1] Williams did not comply with Rule 56.1 of the Local Civil Rules of the
United States District Courts for the Southern and Eastern Districts of New
York ("Rule 56.1").  Rule 56.1 requires that the non-movant file a 56.1
statement containing numbered paragraphs that correspond and respond to each
paragraph in the movant's 56.1 statement.  *See* Local Rule 56.1(b), (d).  The
rule also provides that any statement of fact in the movant's statement will
be deemed admitted for purposes of the motion unless it is specifically
controverted in a correspondingly numbered paragraph in the non-movant's
opposing 56.1 statement.  Local Rule 56.1(c); *see also, e.g.*, *Suares v.
Cityscape Tours, Inc.*, 603 F. App'x 16, 17 (2d Cir. 2015).  However, a
"district court has broad discretion to determine whether to overlook a
party's failure to comply with local court rules."  *Holtz v. Rockefeller &
Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001).  "[W]hile a court 'is not required
to consider what the parties fail to point out' in their Local Rule 56.1
statements, it may in its discretion opt to 'conduct an assiduous review of
the record' even where one of the parties has failed to file such a
statement."  *Id.* (quoting *Monahan v. New York City Dep't of Corrections*, 214
F.3d 275, 292 (2d Cir. 2000)).  As the parties' filings, and exhibits

Based on the undisputed facts and the record before the court, the following provides a detailed overview of (1) Williams' injury and subsequent medical treatment and (2) Maersk's handling of Williams' request for maintenance and cure.

## I.  Williams' Initial Injury & Subsequent Medical Treatment

On June 3, 2015, Williams reported to the Chief Mate of the *Detroit* that four days previously, on May 30, 2015, he had slipped outside the "freezer box" on the *Detroit*. (ECF No. 85-1, Affirmation in Support of Motion for Partial Summary Judgment ("Walsh Aff."), Ex. A, Maersk Medical Log, June 3, 2015.)  Williams alleged that, during his fall, one leg slipped forward, while the other leg remained straight, forcing him into a lunge. (*See, e.g.*, ECF No. 92, Aff. of Dennis M. O'Bryan in Opp. to Mot. for Partial Summ. J. ("O'Bryan Aff."), Ex. A, Transcript of Allison B. Brett's First and Second Depositions ("Brett Dep."), at 25:05-18.)  Williams developed numbness in the front of his left thigh and noticed purple veins on his left knee.  (Maersk Medical Log, June 3, 2015.)  There was no mention of back pain or groin pain at the time.  (*See id.*)

Williams was sent ashore to receive treatment.  (*Id.*) Williams treated at First Choice Emergency in La Porte, Texas, which x-rayed his left thigh, diagnosed him with a left "thigh

_____

thereto, clarify the facts in dispute, the Court need not deem all uncontroverted statements in Maersk's 56.1 statement admitted.

strain," and indicated that he would undergo a "gradual recovery."  (O'Bryan Aff., Ex. B, Medical File of Allison B. Brett for Williams ("Brett File"), at M000247-49.)  The facility found Williams "[f]it for duty, able to work," as of June 3, 2015 (*id.* at M000248), with discharge instructions that Williams "[s]eek immediate medical attention for decreased leg function, worsening pain or numbness, abdominal pain, leg swelling, or other new concerns.  Follow up with your doctor in 2-3 days if not improving." (*Id.* at M000247.)  Williams then returned to the *Detroit* and signed off on June 8, 2015.  (*See* Walsh Aff., Ex. C, *Maersk Detroit* Payroll Voucher, May 26 to June 8, 2015.)

On June 9, 2015, upon returning home to Jacksonville, Florida, Williams presented to Memorial Hospital complaining of pain in his groin.  (Brett File at M000071-84.)  Dr. Quader, a physician at the hospital, diagnosed Williams with "an inguinal strain, also known as a pulled groin," which "is usually due to a full or partial tear to a muscle or tendon in the groin area." (*Id.* at M000071.)  Dr. Quader noted that "[m]ost groin pulls take several weeks to heal completely." (*Id.*)  Dr. Quader signed a note, dated June 10, 2013, excusing Williams from work through June 13, 2015, but indicated that Williams was "medically cleared to return to work, non-restricted duty on June 13, 2015." (*Id.* at M000083.)  Dr. Quader referred Williams to a doctor specializing in "surgery/orthopedics." (*See id.*)

On June 16, 2015, Williams presented to Dr. Yorio, a specialist at an orthopedic institute. (*Id.* at M000085-89.) Dr. Yorio diagnosed Williams with sprains and strains of his left hip and thigh and ordered an MRI of the left hip. (*Id.* at M000086.) Dr. Yorio declared Williams NFD until he underwent an MRI and the results were reviewed. (Walsh Aff. Ex. G, Yorio Records ("Yorio Records").) The requested imaging was completed in late June. (Brett File at M000093-95.) Subsequently, on June 30, 2015, Dr. Yorio declared Williams NFD until Williams underwent a neurology consult and the results were reviewed. (Yorio Records.)

On July 6, 2015, Williams presented to Dr. Hartwig, a neurologist, "with post traumatic slip and fall with residual left lateral thigh numbness." (Brett File at M000097-98.) Dr. Hartwig noted "[p]ossible underlying neuralgia paresthetica." (*Id.*) Neuralgia paresthetica, also referred to as meralgia paresthetica, is a condition characterized by tingling, numbness, and burning pain in the outer part of the thigh, and which is caused by compression of the lateral femoral cutaneous nerve at its exit from the pelvis. *Meralgia Paresthetica*, J.E. Schmidt, M.D., Attorney's Dictionary of Medicine (Matthew Bender, Release No. 53) (hereinafter "ADM").[2] The lateral

---

[2] None of the definitions included herein influence the Court's view as to the scope, causation, or symptoms of any condition, matters which the party must establish at trial through appropriate expert testimony. The Court simply

femoral cutaneous nerve runs down the thigh and provides nerve supply to the skin on the lateral part of the thigh; it is part of the lumbar plexus, which is a web of nerves in the lumbar region of the body. *Nervus Cutaneus*, ADM; *Nervus Cutaneus Femoris Lateralis*, ADM. Dr. Hartwig conducted an electro-diagnostic study which revealed evidence of a "left lateral femoral cutaneous neuropathy." (Brett File at M000097-98.)

On July 24, 2015, Williams presented to Dr. Pagan, a pain medicine specialist, complaining of left groin pain, left thigh pain, left thigh numbness, and difficulty walking. (*Id.* at M000101-04.) Dr. Pagan reviewed Williams' medical records, including Dr. Hartwig's report indicating that Williams tested positive for a left femoral cutaneous neuropathy. (O'Bryan Aff., Ex. G, Deposition of Dr. Hector Pagan ("Pagan Dep."), at 13:12-20.) Dr. Pagan testified that he found Dr. Hartwig's record particularly helpful:

> [S]ince [Williams] was complaining of the left leg, left thigh numbness, you had to suspect that it was a nerve impingement [i.e., compression of a nerve]. It could either be from the lumbar spine or could be a peripheral nerve impingement. In [Williams'] case, the numbness in his presenting symptomatology was compatible with the lateral femoral cutaneous nerve injury, which the mechanism of injury [i.e., an acute stretch through all the tissues of the groin, hip area] was also compatible with an injury to his nerve and region [sic].

(*Id.* at 13:21-14:05.)

recognizes the complexity of the medical evidence and terminology at issue in this action and includes these definitions for ease of reference.

Dr. Pagan's impression was that Williams suffered from, *inter alia*, left groin pain secondary to a sprain/strain; left thigh burning secondary to a lateral femoral cutaneous neuralgia; left lower leg pain secondary to posttraumatic myofascial pain syndrome, or irritation of the muscles and membranes of the back and neck, *Myofascial Syndrome*, ADM; abductor tendonitis; and right lower thigh numbness. (Brett File at M000103.) Dr. Pagan testified that he did not examine Williams' back because "he did not complain of lower back pain and there were no signs of any radiculopathy." (Pagan Dep. at 70:25-71:13.) Dr. Pagan also testified that he did not detect a hernia. (*Id.* at 74:25-75:22.) Dr. Pagan recommended a treatment course to "deactivate" trigger points in Williams' left groin and left lateral thigh muscles through injections and manual therapy. (Brett File at M000103.) Dr. Pagan provided Williams with injections and declared him NFD. (*Id.* at M000104.) Dr. Pagan made substantially similar findings on July 28, July 30, and August 7, 2015, and declared him NFD on the last two dates. (*Id.* at M000124-32.)

On August 12, 2015, Williams presented to Dr. DeCerce, a neurologist, on referral from Dr. Pagan ("with whom he [was] treating with for post-injury pain") to evaluate for left leg neuropathic pain. (*Id.* at M000133-35.) Dr. DeCerce found that Williams suffered from lumbar radiculopathy, posttraumatic

injury to the lateral cutaneous nerve of the thigh,
posttraumatic inguinal hernia, and lumbar sprain/strain injury.
(*Id.* at M000135.)  Dr. DeCerce stated, "In my opinion, the
symptoms are a direct result of the slip and fall that occurred
on [May 30, 2015]."  (*Id.*)  Dr. DeCerce declared Williams NFD
until October 1, 2015.  (O'Bryan Aff., Ex. K, Dr. DeCerce
Restrictions Note, Aug. 12, 2015.)  Imaging completed on August
20, 2015 confirmed a small hernia in the left groin region.
(*Id.* at M000136.)  Dr. DeCerce echoed the findings from his
August 12, 2015 visit following his review of Williams on
September 9, 2015.  (*Id.* at M000143-44.)

On September 4, 2015, Williams presented to Dr. Pagan.
(*Id.* at M000140.)  Dr. Pagan's impression was consistent with
his earlier findings, noting that Williams suffered from left
groin pain, lateral femoral cutaneous neuralgia, left
ilioinguinal hernia, eight leg pain, myofascial pain syndrome,
left inner thigh pain, and abductor tendonitis.  (*Id.*)  Dr.
Pagan "[r]eferred [Williams] to a surgeon for evaluation and
treatment of the left inguinal hernia."  (*Id.*)  Dr. Pagan made a
note to "[r]eassess [Williams'] neuropathic complaints"
following the hernia correction procedure.  (*Id.*)

On September 13, 2015, Williams presented to Memorial
Hospital on referral for consultation in regard to "symptomatic
left inguinal hernia."  (*Id.* at M1000145.)  Impression was left

inguinal hernia, with a note of "[h]istory of trauma to the left hip with residual neurologic effect with sensory and motor function of the left hip." (*Id.*)  On September 15, 2015, Williams discussed the hernia correction procedure with Dr. Behzadi and consented to said procedure.  (*Id.* at M000146.)

On 15, 2015, Williams presented to Dr. Esser, an orthopedist, complaining of worsening leg and hip pain with bruising and stiffness to the thigh.  (*Id.* at M000147-52.)  Dr. Esser diagnosed meralgia paresthetica, disc disease of the lumbar spine, low back pain, and lumbosacral spondylosis.  (*Id.* at M000150-51.)  Dr. Esser indicated that he "believe[d] that [Williams] could likely benefit from his hernia repair to alter the anatomy in the region of the lateral femoral cutaneous nerve." (*Id.* at M000151.)  Williams underwent hernia repair the following day.  (*Id.* at M000153-58.)

Dr. DeCerce treated Williams on September 30, 2015. (*Id.* at M000159-60.)  Dr. DeCerce noted that Williams initially presented with symptoms referable to compression of the lateral femoral cutaneous nerve at the level of the inguinal canal. (*Id.* at M000159.)  When it was discovered that Williams had a hernia, it was recommended he be evaluated and treated surgically.  (*Id.*)  Since Williams showed only some improvement postoperatively, however, Dr. DeCerce appeared to come to believe that Williams' symptoms were of a "slightly different

distribution." (*Id.*) Dr. DeCerce noted that "conceivably there might've been some traction injury [to the lower trunk of the lumbosacral plexus, a network of nerves derived from lumbar roots,] in view of the nature of how [Williams] had fallen," and further indicated that he did not believe Williams had undergone an MRI of the lumbar spine to assess any lumbar nexus to his symptoms. (*Id.*) Dr. DeCerce's diagnoses mirrored his initial findings: lumbar radiculopathy, compression of lateral cutaneous nerve of the thigh secondary to inguinal hernia, posttraumatic inguinal hernia (improved status postoperatively), posttraumatic traction injury to the lower trunk of the lumbosacral plexus, and lumbar sprain/strain injury. (*Id.* at M000160.)

On October 16, 2015, Williams visited Dr. Pagan. (*Id.* at M000161-64.) Dr. Pagan administered a nerve block and diagnosed "[l]eft neuralgia paresthetica from traumatic injury to the left femoral cutaneous nerve," pelvic and perineal pain, pain in the left hip, and other myocitis. (*Id.*) Dr. Pagan provided an additional nerve block on October 23, 2015, at which visit he noted Williams was "going for an MRI of the lumbar region to determine why his legs are still burning," and noted impressions of lower abdominal pain, lateral femoral cutaneous neuralgia, adductor magnus tendonitis, other myocitis, and pain in the left lower leg. (*Id.* at M000172-74.) Dr. Pagan

indicated that Williams believed previous injections in the left groin area gave him relief. (*Id.* at M000172.)

On October 21, 2015, Williams visited Dr. Esser's office. (*Id.* at M000165-69.) A physician assistant dictating for Dr. Esser noted assessments of low back pain, disc degeneration in the lumbar region, lumbar spondylosis, and meralgia paresthetica in the left lower limb. (*Id.*) The report indicates that Dr. Esser "believe[d] [Williams'] pain is from the meralgia paresthetica," and noted the office had ordered an MRI of the lumbar spine to "rule out" whether herniated discs in the lumbar spine could be causing symptoms down the leg. (*Id.*)

On October 23, 2015, Precision Imaging Centers completed the MRI ordered by Dr. Esser. (*Id.* at M000170-71.) The MRI revealed severe spinal stenosis and moderate to severe foraminal stenosis at different spinal ranges. (*Id.*) Dr. Esser met with Williams on November 3, 2015 to review the MRI results. (M000175-78.) Williams noted his pain remained the same despite injections. (*Id.*) Dr. Esser assessed lower back pain and provided some additional color on Williams' condition:

> Mr. Williams has a complex situation. He has an EMG proven lateral femoral cutaneous neuropathy which is causing his lateral left hip numbness. This is neither dangerous nor should it be activity limiting. He also had a recent left hernia surgery without benefit. He has MRI's of the hip and femur which do not demonstrate any significant acute pathology due to a fall.

(*Id.* at M000177.)  Dr. Esser appeared to express uncertainty as
to whether Williams' symptoms resulted from the issues
identified by the MRI, because the severe stenosis was revealed
at a different level than his symptoms.  (*Id.*)  Dr. Esser noted
that the results did not necessarily reflect direct causation
secondary to an injury.  (*Id.*)  Dr. Esser referred Williams for
a spinal injection for pain relief "to see if his numbness over
the anterior left thigh improves at all as well," but also told
Williams that "his lateral thigh numbness is safe and he may
work full duties without limitation" and noted no work
limitations at that time.  (*Id.* at M000178.)

On November 5, 2015, Williams visited Dr. DeCerce.
(*Id.* at M000179-80.)  Dr. DeCerce indicated that Williams
"maintain[ed] that he had no lower extremity symptoms until the
present slip and fall injury" and continued to describe clear
neuropathic symptoms that follow a distribution "consistent with
lumbar radiculopathy."  (*Id.*)  Dr. DeCerce noted that
"[Williams] is unable to go back to his usual occupation with
full duties[,] since these diagnoses [(without stating which)]
are going to likely restrict any such capacities for quite some
time," but that "we [presumably, he and Dr. Pagan] agree that he
can return to work as long as appropriate restrictions are
applied."  (*Id.*)  Dr. DeCerce assessed compression of the
lateral cutaneous nerve of the thigh secondary to inguinal

hernia (stable postoperatively), posttraumatic traction injury to the lower trunk of the lumbosacral plexus ("less likely in view of the MRI findings"), posttraumatic inguinal hernia (improved status postoperatively), lumbar radiculopathy, lumbar disc protrusion, and lumbar sprain/strain. (*Id.*) Dr. DeCerce noted that maximum medical improvement ("MMI") has been obtained from a neurological standpoint but did not indicate the conditions to which this conclusion applied. (*Id.*)

On December 11, 2015, Williams visited Dr. Pagan, continuing to complain of left thigh and groin pain and numbness. (*Id.* at M000191.) Dr. Pagan noted that Williams' symptoms appeared more stable. (*Id.*) Dr. Pagan also withdrew from Williams' treatment team as other physicians were directing his care. (*Id.*) Dr. Pagan appeared to testify that Williams reached MMI as to meralgia paresthetica on December 11, 2015, but this finding does not appear to be noted in the corresponding medical record. (Pagan Dep. at 96:02-20.)

Williams continued to seek treatment under the care of two new physicians: Dr. Hurford, a specialist at Dr. Esser's orthopedic clinic; and Dr. Formoso, a pain medicine specialist.

Dr. Hurford treated Williams on December 18, 2015, noting impressions of low back pain, lumbar stenosis, and lumbar spondylosis. (*Id.* at M000195-98.) Dr. Hurford treated Williams again on January 29, 2016, noting that injections to the spine

did not appear to be helping Williams' symptoms, and made the same assessments as he did following the December 18, 2015 visit. (*Id.* at M000206-10.) Dr. Hurford also suggested that Williams consider lumbar decompression and fusion surgery, but Williams indicated he would like to try to return to work before considering any surgery. (*Id.* at M000209.)

Dr. Formoso treated Williams on January 6, 2016, noting lumbar radiculopathy and lumbar disc degeneration, and administered what appears to be a lumbar injection. (*Id.* at M000199-200.) On January 27, 2016, Dr. Formoso treated Williams again and assessed lumbar stenosis, lumbosacral neuritis, low back pain, meralgia paresthetica, arthritis of lumbar spine, sprain of iliolumbar ligament, and muscle spasm. (*Id.* at M000201-05.) Dr. Formoso administered an injection (presumably, a nerve block, though the report does not specify). (*Id.*) Dr. Formoso examined Williams again on February 11 and March 10, 2016, making largely the same assessments. (*Id.* at M000211-14.) Like Dr. Hurford, Dr. Formoso suggested Williams consider spinal decompression surgery. (*Id.* at M000212.) Williams reiterated his desire to return to work and, as he could take only ibuprofen for pain at sea, Dr. Formoso stopped all other pain medications. (*Id.* at M000214.) Dr. Formoso indicated that Williams "works as a cook on board, and [Dr. Formoso] [was] fine with [Williams] resuming his post there." (*Id.*)

Williams appears to have returned to work in March 2016, roughly ten months after disembarking from the *Detroit*. (O'Bryan Aff., Ex. F, Maersk's October 27, 2017 IME Report ("IME Report"), at 4.)

## II. Williams' Claim for Maintenance & Cure

Alison B. Brett ("Brett"), a Maersk claims manager, handled Williams' claim for maintenance and cure. Brett understands that maintenance and cure is payable to a seaman in the event he is determined not fit for duty and receiving treatment for an onboard injury or illness. (Brett Dep. at 07:24-08:03.) Brett testified that Maersk's cure payments supplemented the insurance provided by Williams' union, the Seafarers International Union. (*Id.* at 85:09-19.) Per Brett, Maersk acted only as a secondary insurer and covered expenses which the union insurer would not pay for injuries or illnesses which manifested themselves during Williams' service aboard a Maersk vessel. (*See id.* at 85:20-86:03.)

Brett reportedly learned of Williams' fall in June 2015. (Brett Dep. at 71:09-15.) Brett was aware of the proposition that, in administering maintenance and cure, all doubts and ambiguities should be resolved in favor of the seaman. (*Id.* at 33:02-06.) Brett also understood maintenance and cure are generally to be paid promptly (*id.* at 139:07-11) and are payable for any injury that arises while a seaman is in

service of the vessel (*id.* at 60:09-12).  As it does not appear that Brett received contemporaneous medical records pertaining to each of Williams' medical visits, the Court reviews her interactions with Williams and his many attorneys.

Brett recalls that, shortly after the accident, the *Detroit* called her to inform her that Williams had alleged an accident on or about May 30, 2015 and was seeking treatment. (*Id.* at 77:21-78:04.)  Brett states that the *Detroit* told her that Williams had been evaluated by a "shore-side" position and was declared FFD.  (*Id.* at 78:11-19.)  As Brett understood it, Williams slipped on the vessel and "kind of [did] the splits," with one leg going in one direction and the other leg moving in the other direction.  (*Id.* at 25:08-19.)  The ship provided Brett with Williams' Request for Medical Treatment form.  (*Id.* at 71:09-72:25; *see also* Walsh Aff., Ex. A, Maersk Line Limited Medical Log, June 3, 2015.)

Brett testified that she opened an "incident file" in Maersk's claims database to track all developments relating to the accident.  (Brett Dep. 79:06-12.)  Brett testified that she recorded Williams' accident as an "incident," not a "claim," because Williams returned to the vessel FFD.  (*Id.* at 79:23-80:05.)  Brett stated that she received, but did not recall exactly when, the initial report diagnosing Williams with a "thigh strain" and finding him FFD, but noting that he would

make a gradual recovery.  (*Id.* at 36:21-37:06.)  Brett

understood that Williams returned to the vessel and completed

his regular hitch.  (*See id.* at 80:25-81:07.)

Brett first spoke with Williams in connection with his

claim for maintenance and cure on June 10, 2015.  (*Id.* at 83:16-

22.)  Williams told Brett that he had signed off the *Detroit* on

June 8, 2015, that he was suffering from thigh pain, and that he

had visited the emergency room, which found him NFD from June 10

through June 13.  (*See id.* at 83:25-85:04.)  Brett advised

Williams that his union benefits were primary, i.e., that Maersk

provided only secondary coverage.  (*Id.* at 85:05-14.)  Brett

asked Williams to fax her the medical records pertaining to his

emergency room visit (*id.* at 85:05-08, 86:04-10) but testified

that Williams did not fax her the medical records at that time.

(*Id.* at 86:11-13.)  Williams called Brett the next day asking

again for the fax number.  (*Id.* at 86:14-25.)  Williams was

initially cooperative with Brett's requests in that he was

providing her with medical records, but Williams later became

uncooperative and stopped providing said records.  (*Id.* at

12:11-21, 13:03-11.)  Brett indicated that she could not

identify when, exactly or approximately, Williams stopped

providing medical records.  (*Id.* at 12:22-13:05.)

On June 11, 2015, Brett emailed Williams a letter

memorializing their conversation.  (Walsh Aff., Ex. F, Benefits

Letter ("Benefits Letter").)  Brett's email stated, "We are aware you have begun receiving treatment following an alleged injury or illness while onboard.  We hope [you] are able to continue to pursue necessary treatment."  (O'Bryan Aff., Ex. I, Brett Email, June 11, 2015 ("Brett Email").)  The letter said that Maersk "will process maintenance checks to you **when you provide a current doctor's note indicating you are not fit for duty and unable to work**."  (*Id.* (emphasis in original).)  The letter stated that Williams is "eligible for reimbursement of [his] medical out-of-pocket expenses relating to [his] injury/illness," and that Williams would be entitled to benefits until he "bec[a]me [FFD] or reach[ed] [MMI]."  (*Id.*)  The letter enclosed an "authorization for release of medical information" form, which Williams was to sign and return to Maersk.  (*Id.*)

Brett testified that she did not believe she had enough information to determine Williams' entitlement to maintenance and cure at this time.  (Brett Dep. at 89:03-06.)  Brett stated that she intended to address this concern by obtaining medical records clarifying whether Williams was NFD and whether his follow-up treatment related to his onboard complaint.  (*Id.* at 89:07-13.)  Brett testified that she later received a NFD but did not recall exactly when.  (*Id.* at 89:14-90:04.)

At some point, Brett recalled that Memorial Hospital provided her with documents confirming its finding that Williams was NFD for from June 10 to June 13, 2015. (*Id.* at 91:15-23.) Brett appeared to concede at her deposition that Maersk owed Williams maintenance and cure for this three-day period (*id.* at 131:08-132:20), but claimed that Williams was not paid maintenance for that time period due to an "oversight" (*Id.* at 92:22-93:02).

On June 18, 2015, Brett reportedly received a call from Williams requesting an MRI, following his visit with Dr. Yorio. (*Id.* at 93:20-94:05.) Brett testified that Williams told her that he was trying to schedule an appointment with an orthopedist but that the doctor would not schedule an MRI without talking to Maersk. (*Id.*) Brett reportedly responded that she had received Williams' records from Memorial Hospital, which declared him FFD as of June 13, 2015. (*Id.* at 94:11-17.) Brett says Williams responded that he had visited a new physician who found him NFD. (*Id.* at 94:20-25.)

Brett testified that she then told Williams she would need to review Dr. Yorio's treatment notes and any primary insurance denial for the MRI. (*Id.* at 95:04-14.) Brett asked Williams to fax her the medical records from his visit with Dr. Yorio. (*Id.* at 95:22-96:05.) Williams allegedly did not fax any records at that time. (*Id.* at 96:06-10.) Brett claims that

she separately sent an email to an unspecified doctor (presumably, Dr. Yorio) requesting medical records relating to Williams' onboard injury. (*Id.* at 90:16-91:11.) Brett provided a fax number and email to which the medical records could be sent but testified she did not receive records in response to this request. (*Id.* at 91:11-14, 96:09-10.)

Brett testified that she could not authorize maintenance as of June 18, 2015, because she "had no records indicating [that Williams] was not fit" for duty. (*Id.* at 95:15-21.) But Brett asserts that she did call Williams' union shortly thereafter, on July 1, 2015, to confirm that Williams continued to be eligible for medical benefits. (*Id.* at 96:11-97:04.)

On August 3, 2015, Brett received correspondence from the first law firm representing Williams, Donald Moses & Associates ("Moses"). (Walsh Aff., Ex. J, Letter from Donald Moses, August 3, 2015.) The letter attached a slip from Dr. Pagan asking to excuse Williams from work from July 24 through September 24, 2015 due to "W/C injury, merchant marine." (*Id.*) Brett testified that, prior to receiving this letter from Moses, she had not seen anything from Dr. Pagan before, nor did she understand which injury Dr. Pagan was referring to. (Brett Dep. at 98:06-11.) Brett testified she could not pay maintenance

based on Moses' letter because she still had "no idea what [Williams'] treatment was related to."  (*Id.* at 98:12-18.)

On August 4, 2015, Brett emailed Linda Wiltshire to request assistance in scheduling an IME for Williams.  (Brett File at M000226.)  Brett testified that she intended for the IME to determine whether Williams was FFD, whether Williams had reached MMI, and whether the treatment Williams was receiving related to his onboard complaint.  (Brett Dep. at 129:12-22.)

On August 6, 2015, Brett responded to Moses.  (Walsh Aff., Ex. K, Letter from Maersk, Aug. 6, 2015.)  Brett explained that Maersk "received a [FFD for Williams] dated [June 13, 2015].  As a result[,] maintenance and cure ended as of that date."  (*Id.*)  Brett further stated that "[Maersk] understand[s] that Mr. Williams has again been determined [NFD] and is pursuing additional treatment.  At this time, [Maersk] is arranging an IME for Mr. Williams.  Following the results of the IME[,] a determination will be made regarding potential reinstatement of maintenance and cure."  (*Id.*)  Brett declined to reimburse Williams' expenses incurred "after his [FFD] determination [as of June 13, 2015]," unless Maersk reinstated maintenance and cure.  (*Id.*)

On August 17, 2015, Brett received a letter from the second law firm representing Williams, Stevenson & Murray ("Stevenson").  (Walsh Aff., Ex. L, Letter from Stevenson, Aug.

17, 2015.)  Stevenson described Williams' fall and alleged that
Williams "severely injured his groin, hip, back, and other parts
of his body due to this incident."  (*Id.*)  Stevenson further
indicated that Williams sought care in LaPorte, Texas, but that
his condition continued to decline.  (*Id.*)  Upon returning to
Florida, Stevenson said, Williams saw a number of physicians.
(*Id.*)  Stevenson stated that Williams underwent a nerve
conduction velocity study, which indicated that he sustained a
severe neuropathic injury to his groin, and that Williams had an
MRI to his hip, which he paid for out-of-pocket.  (*Id.*)
Stevenson noted that Dr. Pagan had declared Williams NFD until
at least September 24, 2015.  (*Id.*)  Brett testified that until
this point, she had been aware of a thigh injury, but had been
unaware of any claim of injury to Williams' groin or hip.  (*Id.*
at 103:12-16.)

On September 11, 2015, Brett received another letter
from Stevenson.  (Walsh Aff., Ex. N, Letter from Stevenson,
Sept. 11, 2015.)  Stevenson stated that Maersk could investigate
Williams' claim, but had to do so promptly.  (*Id.*)  Yet,
Stevenson stated that Maersk had still not scheduled an IME to
determine Williams' entitlement to benefits.  (*Id.*)  The letter
attached a note from Dr. Behzadi stating that Williams would
undergo hernia surgery on September 16, 2015.  (*Id.*)  Brett
testified that, based on Williams' complaint, she understood

that Williams sustained no inguinal injury, presumably including an inguinal hernia, on the boat. (Brett Dep. at 123:04-11.)

Brett testified that the intended IME "never came to fruition" because the nurse practitioner in charge of scheduling exams took leave due to a death in the family. (*Id.* at 111:10-14.) But Brett did ask a physician at George Washington University Hospital ("GW"), Maersk's medical consultants, to review the records in her file. (*Id.* at 109:16-24.) On September 17, 2015, Brett emailed GW the medical records and initial complaint form. (Walsh Aff., Ex. O, Initial GW Opinion.) Brett testified that she did not recall when she received each of the medical records in her file. (Brett Dep. at 14:12-16 (testifying that the records do not contain the dates on which Brett received them but that "it appears" she had documents Bates stamped M000046-268 in her file).) But the "timeline" noted at the bottom of GW's response describes visits with Dr. Quader, Dr. Pagan, Dr. Yorio, Dr. Hartwig, and Dr. Behzadi between June 3 and September 10, 2015. (*Id.*)

On September 18, 2015, Brett received an email from Dr. Keith Boniface of GW providing, in summary form, his opinion of whether Williams' treatment related to his onboard complaint. (Walsh Aff., Ex. O, Email from GW Maritime Medical Access, Sept. 18, 2015.) Dr. Boniface noted that Williams "slipped and had acute thigh pain and was diagnosed with a muscle strain, and has

had persistent numbness of the thigh." (*Id.*) Dr. Boniface stated that Williams treated with an orthopedic surgeon, a neurologist, an occupational medicine specialist, and a general surgeon. (*Id.*) Brett testified that her understanding from reviewing the email was that Williams' treatment did not relate to his onboard complaint. (Brett Dep. at 114:17-116:02.) Brett testified she could not authorize maintenance and cure at this point because Williams' treatment appeared unrelated to his onboard injury. (*Id.* at 116:03-08.)

On November 1, 2015, Brett faxed Dr. DeCerce the benefits letter she previously sent to Williams. (O'Bryan Aff., Ex. J, Brett Fax, Nov. 2, 2015 ("Brett Fax"); *see also* Rep. ¶ 56.1.) Brett asked for "documentation of the connection between Mr. Williams' onboard complaint (thigh pain) and his most recent treatment (hernia surgery)." (Brett Fax.)

Brett testified that on November 30, 2015, she received a letter from a third law firm, Morgan & Morgan. (*Id.* at 116:09-16.) Brett stated that the firm requested copies of statements in Maersk's possession regarding Williams' alleged injury. (*Id.* at 116:23-117:09.) Brett testified that, at this point, in-house Maersk counsel, Gary English ("English"), had taken up primary responsibility for communicating with Williams' attorneys. (*Id.* at 117:16-23.)

On April 1, 2016, GW sent Brett a final report signed
by Drew Maurano, PA-C.  (Walsh Aff., Ex. P, GW Report, Apr. 1,
2016.)  Maurano indicated that since September 18, 2015,
Williams had "continued to have lower back, buttock and thigh
pain with related numbness to the lateral cutaneous nerve
pathway."  (*Id.*)  Maurano noted that "[t]he inguinal hernia
repair that [Williams] had on Sept[ember] 16, 2015 appears to
have no relationship to his injury nor his symptoms," though
"[i]t was thought at the time by his general surgeon and then by
his neurologist that it may have been responsible since the
lateral femoral nerve involved stems from the inguinal region of
his body."  (*Id.*)  The updated timeline describes visits with
Dr. Esser, Dr. DeCerce, Dr. Pagan, Dr. Hurford, and Dr. Formoso
between September 15, 2015 and March 10, 2016.  (*Id.*)

Brett testified that, as of April 1, 2016, she could
not authorize maintenance and cure payments to Williams because
Maersk "ha[d] nothing connecting [Williams'] treatment [for his
hernia and nerve-related problems] to his on-board complaint."
(*Id.* at 119:05-10.)  Brett made no decisions regarding the
payment of maintenance and cure alone.[3]  (*See id.* at 46:23-
49:11.)  Rather, Brett relied, at least in part, on advice from
in-house counsel.  (*Id.*)  Williams challenges Brett's testimony,

---

[3] Brett acknowledged she lacks medical training or schooling but does receive
on-the-job training and frequently reviews medical records on the job.  (*Id.*
at 31-32, 126-27.)

repeated at various points in her deposition, that she did not have sufficient documentation connecting his treatment to his onboard injury, pointing to the medical records, summarized above, some of which allege a nexus between his conditions (and corresponding treatment) and onboard injury.

Brett testified that although she occasionally took an active part in helping crew members manage their medical treatment for onboard injuries, or wrote letters to doctors treating seamen, she did not assist Williams in finding treating physicians. (Brett Dep. at 145:09-19, 47:15-18, 49:07-10.) Brett testified that she did not recall speaking with, or reaching out to, any of Williams' treating physicians with questions as to the medical records she received. (*Id.* at 21:04-06, 43:20-24.) Nor did Brett recall receiving or requesting information noting that Williams had reached MMI. (*Id.* at 124:03-25.)

### III. The Instant Action & Subsequent Developments

On December 2, 2016, Williams filed the instant action against Maersk for negligence under the Jones Act, 46 U.S.C. § 30104, and claims for unseaworthiness, maintenance, cure, and wages under the General Maritime Law. (ECF No. 1, Compl.) Williams seeks, *inter alia*, punitive damages on the basis that Maersk "failed to provide timely fulfillment of its maintenance

and cure obligations in a willful, intentional, recalcitrant and reckless manner." (ECF No. 58, Sec. Am. Compl.)

On October 9, 2017, Williams appeared before Dr. Desrouleaux for an IME. (IME Report.) The IME does not state whether Maersk arranged for the examination, but it is conveyed to Williams' counsel along with a cover letter from Maersk's counsel. (*Id.*) Dr. Desrouleaux performed an independent neurology examination on Williams. (*Id.*) Dr. Desrouleaux indicated that Williams continues to report pain in his lower back, left hip, and thighs. (*Id.*) Dr. Desrouleaux indicated that, "[a]fter reviewing the records, it seems the claimant suffered from meralgia paresthetica diagnosed by nerve conduction and EMG in 2015 and he was [FFD] notwithstanding the numbness and tingling in the left thigh." (*Id.*) Dr. Desrouleaux further concluded that "[a]fter review of the claimant's file, taking a history and performing a physical examination, it appears that the above-diagnosed injury is causally related to the accident on May 30, 2015." (*Id.*)

On December 11, 2017, Maersk issued a check in the amount of $4,416 covering disputed maintenance calculated at $16 per day multiplied by 276 days (roughly nine months) in accordance with the Collective Bargaining Agreement. (Walsh Aff., Ex. CC, Check to Williams.) Maersk attached a "List of Payments to Health Care Providers" to its motion papers, which

does not indicate any payments made by Maersk.  (Walsh Aff., Ex. AA, Chart of Outstanding Bills ("Chart of Outstanding Bills").)

At some point, Maersk learned that Williams failed to disclose a prior injury to his back sustained in a March 2012 automobile accident.  (*See* Walsh Aff., Ex. X, June 28, 2012 Medical Report.)  According to a June 2012 medical report, Williams suffered from pain which radiated into the back of his thighs and caused some tingling on the front of his legs.  (*Id.*)  These symptoms apparently resulted from a lumbar spine injury.  (*See id.*)  Williams sued as a result of these automobile accident injuries and received a settlement in 2014.  (Walsh Aff., Ex. Y, August 18, 2014 Settlement Agreement.)

In his employment application to Maersk, Williams misrepresented that he had not undergone any medical treatment in the five years prior to his employment application, notably omitting a 2012 MRI of his lumbar spine.  (Walsh Aff., Ex. Z, Maersk Pre-Assignment Questionnaire.)  In sworn deposition testimony in the instant case, Williams also denied back problems after 1992.  (O'Bryan Aff., Ex. H, Transcript of Donald J. Williams' June 22, 2017 Deposition ("Williams Dep."), at 61:05-10.)  Williams withdrew his claim for maintenance and cure as to any back injury shortly thereafter, but did not indicate which specific conditions and treatments, of all those identified and provided by his physicians, pertained to his

claim for a "back injury." (*See* ECF No. 82, Mar. 25, 2019 Letter from O'Bryan ("Plaintiff has agreed to the withdrawal of the maintenance and cure claim for a back injury.").)

## Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), "and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "The nonmoving party must 'go beyond the pleadings, and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Davis v. State of New York*, 316 F.3d 93, 100 (2d Cir. 2002) (quoting *Celotex Corp.*, 477 U.S. at 324).

In determining whether summary judgment is appropriate, "[a]ll ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual

record must be drawn in that party's favor." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-movant, summary judgment is improper. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

## Discussion

A seaman injured during his service aboard a vessel is entitled to "maintenance, cure, and wages." *Messier v. Bouchard Transp.*, 688 F.3d 78, 81 (2d Cir. 2012), *as amended* (Aug. 15, 2012) (citing *Rodriguez Alvarez v. Bahama Cruise Line, Inc.*, 898 F.2d 312, 315-16 (2d Cir. 1990)). "Maintenance" payments compensate a seaman for the cost of food and lodging while he recovers at home. *Id.* at 83-84. "Cure" payments compensate a seaman for the reasonable and necessary medical expenses he incurs to treat the illnesses or injuries sustained during his service aboard the vessel. *Id.*

"The rule of maintenance and cure is simple and broad: a seaman is entitled to maintenance and cure for *any* injury or illness that occurs or becomes aggravated while he is serving the ship." *Id.* at 83-84 (citing *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962)). "[W]hen the injury occurred, not when it started to present symptoms," matters. *Id.* at 85. "The sailor

bears the burden of persuasion to prove his or her right to
maintenance and cure." *Haney v. Miller's Launch, Inc.*, 773 F.
Supp. 2d 280, 290 (E.D.N.Y. 2010); *see also* Federal Trial
Handbook Civil § 64:34 (4th ed.) ("A [seaman's] burden of proof
. . . is slight. He need only establish that he was injured or
became ill while subject to the call of duty as a seaman.").
"Once a seaman establishes his right to payments, the burden
shifts to the shipowner to prove that the injured employee has
reached a point of maximum medical cure." *Haney*, 773 F. Supp.
2d at 290 (citing *McMillan v. Tug Jane A. Bouchard*, 885 F. Supp.
452, 459, 460 (E.D.N.Y. 1995)). In administering maintenance
and cure, any ambiguities or doubts "'are resolved in favor of
the seaman.'" *Messier*, 688 F.3d at 83-84 (quoting *Vaughan v.
Atkinson*, 369 U.S. 527, 532 (1962)).

A shipowner who refuses to pay maintenance and cure is
subject to an escalating scale of liability:

> [A] shipowner who is in fact liable for maintenance and
> cure, but who has been reasonable in denying liability, may
> be held liable only for the amount of maintenance and cure.
> If the shipowner has refused to pay without a reasonable
> defense, he becomes liable in addition for compensatory
> damages. If the owner not only lacks a reasonable defense
> but has exhibited callousness and indifference to the
> seaman's plight, he becomes liable for punitive damages and
> attorney's fees as well.

*Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987);
*Atlantic Townsend v. Townsend*, 557 U.S. 404, 424-25 (2009)
(finding punitive damages available, as they otherwise are under

common law, for "willful and wanton disregard of the maintenance and cure obligation").  To state a claim for punitive damages based on a shipowner's failure to provide maintenance and cure, "a seaman must allege that: (1) he is entitled to payments for maintenance and cure; (2) the ship owner did not satisfy its obligation to provide him with maintenance and cure; and (3) the ship owner's failure resulted from a willful and wanton disregard of its maintenance and cure obligation." *Kalyna v. City of New York*, No. 16-CV-273 (AMD) (CLP), 2018 WL 1342488, at *4 (E.D.N.Y. Feb. 28, 2018), *R&R adopted*, No. 16-CV-273 (AMD) (CLP), 2018 WL 1335353 (E.D.N.Y. Mar. 15, 2018).

"Courts have devised a variety of verbal formulations to describe the nature and extent of misconduct that will support a claim for punitive damages," including "willful," "wanton," or "outrageous." *Id.*; *see also Hicks v. Vane Line Bunkering, Inc.*, No. 11-CV-8158 (KBF), 2013 WL 1747806, at *6 (S.D.N.Y. Apr. 16, 2013), *aff'd sub nom. Hicks v. Tug PATRIOT*, 783 F.3d 939 (2d Cir. 2015) ("reflect[s] utter disregard for the potential consequences of the act on the safety and rights of others," or "shocking conduct"); *In re Marin Sulphur Queen*, 460 F.2d 89, 105 (2d Cir. 1972) ("gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and

wanton misconduct").[4]  However phrased, the critical question is

whether the shipowner's conduct evidences bad faith.  *See, e.g.*,

*Roberts v. S. S. Argentina*, 359 F.2d 430, 431 (2d Cir. 1966).

Courts place particular emphasis on the shipowner's

good faith in investigating the seaman's claim for maintenance

and cure.  *See, e.g.*, *McMillan*, 885 F. Supp. at 466 (citing

*Rodriguez Alvarez*, 898 F.2d 312, 316).  Conduct sufficient to

demonstrate bad faith in denying a claim for maintenance and

cure includes: "(1) laxness in investigating a claim; (2)

termination of benefits in response to the seaman's retention of

counsel or refusal of a settlement offer; and (3) failure to

reinstate benefits after diagnosis of an ailment previously not

determined medically."  *Tullos v. Resource Drilling, Inc.*, 750

F.2d 380, 388 (5th Cir. 1985).

a. Scope of Williams' Claim for Maintenance & Cure

Williams initially appeared to seek recovery of

maintenance and cure payments for the period during which he

underwent treatment for thigh, groin, and back problems.  After

Maersk discovered that Williams failed to disclose prior lumbar

---

[4] Decisions like *Sulphur Queen*, which discuss when a seaman is entitled to
attorney's fees for failure to pay maintenance and cure, are relevant; awards
of attorney's fees in the maintenance and cure context turn on factors which
"sound in punitive damages."  *Hicks v. Tug PATRIOT*, 783 F.3d 939, 944 (2d
Cir. 2015) (citing *Kraljic v. Berman Enterprises, Inc.*, 575 F.2d 412, 416 (2d
Cir. 1978), *abrogated on other grounds by Hicks*, 783 F.3d 939 ("Recovery of
[attorney's] fees is therefore based upon the traditional theory of punitive
damages.")).

injuries sustained in a 2012 car accident, Williams agreed to withdraw his maintenance and cure claim for any back injury. The Court, therefore, briefly reviews the remaining injuries for which Williams claims maintenance and cure.

As an initial matter, the parties dispute which injuries resulted from Williams' accident aboard the *Detroit* on May 30, 2015. Certain physicians – for instance, Dr. DeCerce – noted (at least in certain records) that Williams' conditions generally related to his onboard injury. Others, including Dr. Boniface, found that Williams' conditions did not. Based on the disputed medical opinions, the court cannot limit its consideration of Maersk's good faith in denying Williams' claim to only that evidence relating to his inguinal strain and inguinal hernia.

This uncertainty is further compounded by the fact that, even if only certain injuries resulted from Williams' accident aboard the *Detroit*, there is dispute as to which injuries caused Williams' disabilities for purposes of maintenance and cure. Maersk asserts that Williams' withdrawal of his claim for a back injury leaves only the hernia-related injuries as compensable in this action. (*See* Mot. at 2.)

Williams, however, maintains that the treatment related to the hernia and "nerve compression in his inguinal/groin area, lateral femoral cutaneous nerve," remains

compensable.  (Opp. at 3.)  Williams purports to differentiate
these nerve problems from his back condition, arguing that just
because he "may have *additional* lumbar spine issues[, which
manifested themselves later on in his treatment,] does not
torpedo his maintenance and cure claim for injury to his lateral
femoral cutaneous nerve sustained in the service of the ship."
(*Id.* at 4 (emphasis added).)

Williams will bear the burden of proof at trial.  Here
in opposing summary judgment, he must show there is a genuine
issue to be tried based on evidence from which a jury could find
in his favor.  Unfortunately, Williams' treating physicians did
not clearly document which of Williams' injuries were disabling.
Their NFD determinations state only that Williams could not
work; they did not specify whether the femoral nerve irritation
or back condition, or both, was disabling.  (*See, e.g.*, Brett
File at M000104, -127, -130, 265; Rep. at 2.)  As a result, the
parties continue to dispute whether treatment for the
aforementioned conditions is compensable.  In any event, the
court cannot limit its analysis to Maersk's denial of only the
hernia-related treatment provided in Fall 2015.  (*See* Rep. at
2.)

   b. Putative Bases for a Punitive Damages Award

Williams asserts that punitive damages are warranted
for Maersk's denial of his claim for maintenance and cure.

Maersk appears to be correct in arguing that damages awards typically arise from more egregious conduct than Maersk's. *See, e.g.*, *Rodriguez Alvarez*, 898 F.2d at 317 (shipowner "stonewalled" claim, and demanded seaman submit to exam in New York even though he had returned to Honduras); *Hicks*, 2013 WL 1747806 (shipowner surveilled seaman, showing video to doctor and misrepresented requirements of job, and then relied on doctor's determination to terminate benefits; seaman lost home and health insurance, potentially due, in part, to shipowner's refusal to pay maintenance and cure); *Ritchie v. Grimm*, 724 F. Supp. 59, 62 (E.D.N.Y. 1989) (shipowner initially made payments but stopped them when seaman filed a legal action). Though the Court remains skeptical that Williams will prevail at trial, evidence in the record could support a finding of bad faith.

i. *Reliance on Conflicting Medical Records*

Williams argues that Maersk used Memorial Hospital's prospective June 10, 2015 FFD declaration as a pretext to deny maintenance and cure for future treatment. (Opp. at 18-20.) Brett concedes that the June 10, 2015 letter finding Williams not fit for duty until June 13, 2015 gave rise to an obligation to pay maintenance for the intervening three-day period. (Brett Dep. at 92:22-93:01, 131:08-132:20.) The onus thus shifted to Maersk to show Williams had reached MMI. Maersk argues the June 10, 2015 letter prospectively served this function, as it found

Williams FFD as of June 13, 2015 without suggesting that he
required further treatment.  (Mot. at 10-11; Rep. at 8.)
Williams counters that the letter explained that it would take
several weeks for him to fully recover, suggesting that he had
not reached MMI at that time.  (Opp. at 5-6.)  Maersk contends
this argument is "specious," arguing that "[i]f the physicians
wanted to continue treatment," they would have so specified.
(Rep. at 4.)  But Williams' referral to another physician
suggests that further treatment might have been required.  (Opp.
at 19).[5]

        Even if Maersk is correct that the letter
satisfactorily showed that Williams reached MMI, this still
leaves unresolved the far more substantial question of whether
Maersk denied Williams' later claims for maintenance and cure –
whether styled as reinstatement requests or continuations – in
bad faith.  Maersk acknowledges that Williams "ha[d] again been
determined [NFD]" and sought to arrange an IME, after which "a

---

[5] Some authority suggests FFD and MMI determinations are separate, *see, e.g.*,
*McMillan*, 885 F. Supp. at 457 (E.D.N.Y. 1995) (citing *Koslusky v. United
States*, 208 F.2d 957, 959 (2d Cir. 1953)) ("[T]he issues of whether a seaman
is fit for duty and whether he or she has reached maximum medical cure are
separate and distinct."); *Carlsson v. United States*, 252 F.2d 352, 353 (2d
Cir. 1958) ("[T]he right to maintenance and cure may continue to exist, even
after periods of work, or the granting of a fitness certificate, until
maximum rehabilitation has been attained."), but that does not inevitably
mean that the same evidence cannot support both findings, *see, e.g.*, *Smith v.
Trans-World Drilling Co.*, 772 F.2d 157, 160 n. 2 (5th Cir. 1985) (testimony
of seaman's treating physician that he discharged seaman to return to work
sufficient to support a jury finding of maximum cure).

determination [would] be made regarding potential reinstatement of maintenance and cure."  (Letter from Maersk, Aug. 6, 2015.)

"When a seaman reasserts a claim for maintenance and cure after such payments have already been terminated, it becomes the employer's obligation to reinstate such payments." *McMillan*, 885 F. Supp. at 467-68; *see also Brown v. OMI Corp.*, No. 92-CV-5371, 1994 WL 714445, at *2 (S.D.N.Y. Dec. 21, 1994). "If the employer refuses to reinstate maintenance and cure, it bears the burden of establishing that it had a legitimate reason for so refusing."  *Id.* (citing *Sammon v. Cent. Gulf S. S. Corp.*, 442 F.2d 1028, 1029 (2d Cir. 1971)).

Williams produced records which arguably connect his various ailments to his onboard injury.  (*See, e.g.*, Pagan Dep. at 91:17-21 ("[T]he diagnoses that [Dr. Pagan] identified and all the treatments provided by [his] service were directly related to the injuries sustained on [May 30, 2015]."); Brett File at M000133-35 ("In [Dr. DeCerce's] opinion, the symptoms are a direct result of the slip and fall that occurred on [May 30, 2015].").)  It is not clear exactly when Williams produced each such record, however, and Brett does not recall.  The timelines set forth in GW's opinions provide some context (*see, e.g.*, Initial GW Opinion (describing records from First Choice, Memorial Hospital, Dr. Yorio, Dr. Hartwig, and Dr. Pagan, but not Dr. DeCerce); GW Report (setting forth timeline through

March 10, 2016, including records referenced in initial report and those from Dr. DeCerce, Dr. Esser, and others)), but this lack of clarity makes it difficult to determine exactly when Brett received medical records showing a potential nexus between Williams' on-board injury and subsequent conditions.

In this action, it appears that Williams' physicians initially focused on his groin and thigh, and then shifted their attention to his lumbar region, which had been previously injured. Several physicians, including Dr. DeCerce and Dr. Pagan, however, diagnosed Williams' nerve compression and hernia, among other things, as resulting directly from his accident board the *Detroit*. There is also ambiguity arising from the NFD documents as to which of Williams' injuries caused his disability. It is, therefore, not unreasonable to argue that, without reaching out to treating physicians to get more clarity, it was doubtful that Maersk could conclusively rule out whether the ship-related injuries caused Williams' disability.

Since Brett, at some point, received medical records showing that the treatment sought related to Williams' accident aboard the *Detroit*, the burden shifted to Maersk to investigate Williams' claim and provide a valid reason for denying maintenance and cure payments. Brett proffered the lack of a nexus, determined by way of advice from in-house counsel and the medical consultant – as a basis for denying the claim. The GW

email noted that the lateral femoral cutaneous problem did not result from Williams' onboard injury, as the condition is regularly caused by "compression under the inguinal ligament by adipose tissue, tool belts, or restrictive clothing." (Initial GW Opinion.) The GW report made the same findings as to the left femoral cutaneous nerve compression, and further found that the hernia had no relationship to Williams' injury or symptoms, though it recognized that it was "thought at the time . . . that [the] hernia may have been responsible since the lateral femoral nerve involved stems from the inguinal region of his body." (GW Report.) GW traced Williams' injuries to lumbar problems, and in particular, lumbar radiculopathy. (*Id.*)

Maersk argues that its reliance on certain opinions, in light of the conflicting medical evidence as to the connection between Williams' conditions and onboard injury, precludes a finding of bad faith. *See, e.g.*, *All. Marine Servs., LP v. Youman*, No. CV 17-8124, 2018 WL 6523134, at *9 (E.D. La. Dec. 12, 2018) ("[Shipowner's] reliance in part on a conflicting medical opinion as part of a broader investigation into the veracity of a seaman's injury fails to reach the threshold of unreasonable, let alone egregious or arbitrary or bad faith, conduct."). Denying maintenance where there is conflicting medical evidence does not automatically warrant

punitive damages.  But, in this action, there is sufficient evidence to suggest arbitrariness.

Maersk's decision to rely on certain medical records, for instance, the GW reports, and in-house counsel over Williams' treating physicians (i.e., those finding a nexus between the onboard injury and treatment sought) "may not be arbitrary and capricious, but it is sufficient evidence entitling [Williams] to have the jury resolve his arbitrary and capricious claim."  *Tullos*, 750 F.2d at 389; *see also Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987); *Bachir v. Transoceanic Cable Ship Co.*, No. 98-CV-4625 (JFK), 2000 WL 511621, at *1-3 (S.D.N.Y. Apr. 28, 2000) (declining to grant summary judgment on punitive damages, despite good faith in investigating claim, because there existed conflicting medical evidence as to necessity of further treatment, and since all doubts were to be construed in favor of seaman, questions remained as to whether shipowner's conduct was arbitrary or capricious); *Rowan v. Chem Carrier Towing, LLC*, No. 12-CV-712, 2015 U.S. Dist. LEXIS 58646, at *16 (E.D. La. May 5, 2015); *Synder v. L & M Botruc Rental, Inc.*, 924 F. Supp. 2d 728, 734 (E.D. La. 2013); *Barclay v. Cameron Charter Boats, Inc.*, No. 09-CV-462, 2011 WL 3468380, at *3 (W.D. La. Aug. 8, 2011).

ii. *Failure to Conduct a Sufficient Investigation*

Williams next challenges Maersk's investigation as deficient. (*See* Am. Compl. ¶ 5(a), (d); Opp. at 23.) There is no doubt that Maersk may "investigate a claim for maintenance and cure before tendering any payments to the seaman – without subjecting itself to liability for compensatory or punitive damages." *Boudreaux v. Transocean Deepwater, Inc.*, 721 F.3d 723, 728 (5th Cir. 2013). "Where doubt exists . . . a vessel owner may request reasonable documentation from a seaman before it commences payment of maintenance that may prove both lengthy and expensive." *McWilliams v. Texaco, Inc.*, 781 F.2d 514, 519 (5th Cir. 1986). The shipowner must, however, conduct any investigation in good faith, *see McMillan*, 885 F. Supp. at 466; *Rodriguez*, 898 F.2d at 316, and cannot avoid liability where it is guilty of laxness in investigating a claim that would have been found to be meritorious, *McWilliams*, 781 F.2d at 519 (citing *Breese*, 823 F.2d at 104).

Brett requested medical records from Williams and appears to have reviewed them. *Compare, e.g.*, *Breese*, 823 F.2d at 104 (finding investigation too lax where it "did not include an inquiry of any physician . . . or a review of any . . . medical records"). Brett sent the records to GW for a medical review and spoke with in-house counsel for advice in coming to her conclusion. And, Brett attempted to schedule an IME to

consider the nexus between the conditions for which Williams sought treatment and his onboard injury.

On the other hand, even if Maersk need not, by law, conduct an IME, it relied on the IME as a reason to withhold reinstatement of maintenance and cure, and an IME did not occur for over two years. It is not unreasonable to question whether the reason proffered justifiably explains a two-year delay. Although Maersk appears to have scheduled some investigation in place of an IME, i.e., having a medical consultant review the records, it raises questions that Brett sought out no further clarifying information from Williams' treating physicians and simply adopted the findings of the non-treating medical consultant, particularly in light of the asserted lack of clarity throughout Williams' medical records. Notably, the IME ultimately found a nexus between Williams' meralgia paresthetica and his accident aboard the *Detroit*. (*See* IME Report.) The IME did not address the hernia, which Brett testified was a principal goal of the examination. (*See id.*)

iii. *Promises that Maersk Would Pay Maintenance & Cure*

Williams alleges Maersk promised to pay for his medical services, a promise on which Williams and his medical provider(s) relied in continuing treatment. (Am. Compl. ¶ 5(b), (c), (e).) Williams further asserts that Maersk indicated that all he had to do to receive maintenance and cure was to submit

43

NFD slips.  (Opp. at 23.)  Williams cites Brett's June 11, 2015 maintenance letter, which states that Williams would receive maintenance checks when he provided NFD slips, and notes that Maersk provided no benefits despite receiving several NFD slips from Dr. Yorio, Dr. Pagan, and Dr. DeCerce.  (Benefits Letter.) Williams also cites Brett's email conveying the June 11, 2015 letter, which stated that Brett hoped Williams could continue pursuing necessary treatment (Brett Email), and Brett's November 2, 2015 fax to Dr. DeCerce conveying the benefits letter (Brett Fax).

Williams reads too much into Brett's letters.  The communications cited by Williams make clear that Maersk's provision of maintenance and cure was conditioned on the treatment relating to Williams' onboard injury.  Maersk sent the letter in response to its receipt of information that Williams "sustained an alleged injury or illness while onboard a Maersk Line, Limited vessel."  (Benefits Letter.)  The fax to Dr. DeCerce similarly states that Maersk "only acts as a secondary insurer for . . . treatment related to [Williams'] onboard complaint."  (Brett Fax.)  Moreover, Williams can hardly rely on Brett's platitude as evidence of bad faith.  Reading the record as a whole, there is no indication that Maersk's communications constituted unconditional promises to pay maintenance and cure.

iv. *Aggravation of Williams' Underlying Condition*

Williams argues Maersk "needlessly prolonged and aggravated his underlying condition by denying him maintenance and cure clearly owing[,] thus forcing him to hire a lawyer and return to work because of his maintenance and cure deprivation." (Am. Compl. ¶ 5(f), (h).)  The "clearly owing" aspect is addressed elsewhere.  The unique aspect of this assertion is Williams' claim that Maersk aggravated his condition by denying him treatment for the injury to his lateral femoral cutaneous nerve, specifically, the nerve block recommended by Dr. Esser on November 3, 2015.  (Opp. at 3; Brett File at M000177-78.) Williams does not cite any evidence, however, that the lack of receipt of this nerve block prolonged or aggravated his condition, and does not address the potential MMI findings made shortly thereafter by both Dr. DeCerce and Dr. Pagan.

Williams also argues Maersk's failure to arrange for appropriate medical care for Williams caused him to undergo "duplicative" care.  (Opp. at 23.)  The only support for this position is that Brett "sometimes" took an active part in treatment of other seamen.  (*Id.*)  Neither of the cases Williams cites in support of his argument – *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 376 (5th Cir. 1981), nor *Satterfield v. Harvey Gulf Int'l Marine*, No. 15-5780, 2016 U.S. Dist. LEXIS 138272, at *7 (E.D. La. Oct. 5, 2016) – requires that a

shipowner act as a patient coordinator.  Instead, the cases
indicate that a shipowner cannot deny the seaman prompt
treatment, which – given that the *Detroit* sent Williams ashore
for treatment on June 3, 2015, the day he reported his injury –
does not appear to be an issue in this case.

> v. *Payment of Maintenance but Not Cure*

Finally, Williams argues Maersk's bad faith is evident
from the fact that it issued a maintenance check without
coextensive payment of outstanding cure.  (Am. Compl. ¶ 5(g).)
Maersk paid Williams $4,416 in maintenance on December 11, 2017,
but Williams provides no basis for admitting this check over
Maersk's assertion of Federal Rule of Evidence 408.  (*See* Mot.
at 11.)  That rule prohibits a party from admitting testimony
that an opposing party "furnish[ed] . . . a valuable
consideration in compromising or attempting to compromise the
claim."  Fed. R. Evid. 408.  Williams has, consequently, failed
to show that the check constitutes admissible evidence.

Maersk's apparent failure to pay cure for Williams'
June 3, 2015 First Choice Emergency visit and his June 9, 2015
Memorial Hospital visit, however, are more questionable.  Brett
appeared to concede that Maersk owed Williams maintenance from
June 10 to June 13, 2015.  (Brett Dep. at 92:22-93:02; 131:08-
132:20.)  Brett testified the late maintenance payment resulted
from negligence on her part, which would not support a claim for

punitive damages.  *See All. Marine Servs., LP v. Youman*, No. 17-8124, 2018 U.S. Dist. LEXIS 209455, at \*21-22 (E.D. La. Dec. 12, 2018).  Yet, despite Williams raising the apparent lack of corresponding cure payments in his opposition, Maersk does not dispute – and provides no explanation for – its failure to pay cure for the relevant time period, despite the rule that both are generally co-extensive, *see Vella v. Ford Motor Co.*, 421 U.S. 1, 6 (1975).  The parties' discussion of which bills remain outstanding leaves much to be desired, *see* Chart of Outstanding Bills, but given the ambiguity, there may be evidence of Maersk's non-payment of cure for a period during which maintenance was concededly owing.

      c. <u>Williams' Own Misconduct</u>

      Maersk cites evidence that Williams concealed a prior back injury and states that "[o]ne must come into equity with clean hands."  (Mot. at 14.)  Williams' apparently false representations, including that he testified under oath that he did not have any back injury (Williams Dep. at 61:05-10) and that he appears not to have disclosed to his physicians that he sustained a back injury (*see, e.g.*, Brett File at M000177-78), raise serious questions regarding his credibility as a witness. If Maersk establishes that all of Williams' disabling injuries stem from his back problems, not his fall aboard the *Detroit*, he

may be barred from recovering any maintenance and cure. *Sammon*, 442 F.2d at 1029.

But Maersk does not cite authority showing that Williams' conduct would operate as a total bar to his claim for punitive damages, rather than just supporting a fraudulent concealment defense. Nor does Maersk address how Williams' concealment affected its alleged failure to pay maintenance and cure prior to the time Maersk learned of his concealment, given that Maersk had denied claims for maintenance and cure pertaining to back injuries for potentially a substantial period during which it was unaware of his condition. *See, e.g.*, *Rose v. Miss Pac., LLC*, No. 09-cv-00306, 2012 U.S. Dist. LEXIS 2997, at *24 (D. Or. Jan. 10, 2012) (explaining that fraudulent concealment defense, properly asserted, may defeat claim that shipowner acted in bad faith, but not indicating that fraudulent concealment would, as a rule, bar an award of punitive damages). Given the above, the Court finds that Maersk has not, in the instant motion, met its burden of proffering sufficient undisputed material facts and legal authority to establish that it is entitled to summary judgment on Williams' punitive damages claim based on concealment.

## Conclusion

For the reasons set forth above, the Court finds that there is evidence in the record which could support a finding

that Maersk denied Williams' claim for maintenance and cure, at least in part, in bad faith.  Maersk's motion for partial summary judgment is therefore DENIED.  Williams bare request for summary judgment (*see* Opp. at 20) – unaccompanied by any motion or sufficient proof to establish his entitlement to maintenance and cure, an element of a punitive damages claim, *see Kalyna*, 2018 WL 1342488, at *4, as a matter of law – is also DENIED.

Accordingly, the Court hereby ORDERS the parties to proceed to a final, pre-trial settlement conference before Magistrate Judge James Orenstein.  Within one week of said conference, the parties shall inform the Court whether they have settled this action or, alternatively, intend to proceed to trial.  If the latter, the parties shall jointly submit proposed trial dates after June 1, 2020, and indicate whether they will consent to trial before a magistrate judge.

**SO ORDERED.**

Dated:    Brooklyn, New York
          March 31, 2020

                                   /s/
          _____
          Hon. Kiyo A. Matsumoto
          United States District Judge
